[Civ. No. 5881. Third Appellate District.—January 24, 1938.]

FRANK CAREY, Respondent, v. KRAFT–PHENIX CHEESE CORPORATION (a Corporation) et al., Appellants. ·

Seth Millington for Appellants.

Ware & Ware for Respondent.

THOMPSON, J.—The defendants have appealed from a judgment which was rendered against them for the agreed purchase price of an exclusive property right held by the plaintiff in a specific territory in which to buy and sell all Kraft products such as cheese, mayonnaise, etc.

The appellants contend that the agreement to purchase the territorial rights was conditional upon the plaintiff refraining from engaging in a competitive business in that territory and that the offer to purchase the route is without consideration and void for the reason that plaintiff owned no property right which he could sell. The respondent asserts that he possessed property rights in the business which he had a lawful right to and did sell to the defendants and that even though he held but a doubtful property right the transaction and agreement to compromise the claim furnish a sufficient consideration upon which to enforce the purchase.

The Kraft-Phenix Cheese Corporation is engaged in manufacturing and selling its brands of cheese, mayonnaise and similar products in California and elsewhere. The Kraft Associated Distributors, Inc., was engaged in marketing those commodities. About 1925 the plaintiff purchased for the sum of $5,800 from V. R. Johnson, a private owner of territory, the exclusive right to purchase, sell and distribute the Kraft products in the counties of Yolo, Yuba, Sutter, Butte, Glenn, Colusa, Tehama and Shasta. That right was approved by the Kraft corporations. About two years later Mr. Carey sold the northerly portion of his district to his son-in-law, L. L. Broderick, for $3,000. That sale was also approved by the defendants. No written contracts with the representatives of the Kraft companies were executed. There were some twenty-five or thirty different distributors of Kraft products in northern California, each of whom possessed exclusive rights to his respective territory. These districts were not purchased from the Kraft companies. They were bought and sold by the owners independently of the Kraft companies, but the distributors' rights were recognized and approved by those companies. The uniform custom was to treat these districts as the property

of the respective so-called distributors, who bought the Kraft products from the companies at agreed prices "less than wholesale prices therefor" and sold them to their personal customers at uniform prices fixed by the companies. When products were purchased from the companies by the distributors, the title to the goods vested in the distributors. There appears to have been no privilege of returning to the companies unsold products. The distributors furnished their own motor vehicles and equipment for conducting their businesses. Kraft signs were painted on the distributing machines by agreement of the respective parties. The distributors solicited and procured their own customers within their respective districts. They were personally responsible for all sales of produce and the accounts of such sales belonged to the distributors. The Kraft companies had no property interest in such accounts. The Kraft organizations, however, did periodically send a representative through the districts to help the distributors to improve and increase their businesses and to see that their products were supplied in standard condition. These routes were recognized by the companies as the exclusive property of the distributors. At a convention of the distributors held in San Francisco in 1933, at which twenty-five or thirty representatives were present, Mr. Kraft, himself, told them they were the owners of their respective businesses in their several districts. Mr. Carey testified in that regard: "He said it was our business, and he recognized it as such." In 1935 the produce corporations decided to change their plan of distribution and to thereafter market their products through agents to be employed on fixed salaries. Pursuant to that plan they notified each distributor, including this plaintiff, to that effect. He and his son-in-law each received letters from the Kraft-Phenix Cheese Corporation dated May 22, 1935, reading in part:

"It is our plan *to buy the businesses* of the majority of our distributors in northern California. . . . It has been our intention to get up to see you and Frank Carey. . . . (We) want you to set up a statement of your business so that when the time comes you will have everything in readiness *and know exactly what your business is worth.*"

It appears that the businesses of the several distributors consisted of exclusive rights to buy and sell the Kraft commodities in their own territories, the equipment possessed and used by them for that purpose, the Kraft commodities pur-

chased by them which remained unsold, and the good-will acquired by securing and serving their many customers throughout their districts. When the change in the plan of marketing goods was made, it appears that each distributor was paid by the defendants for his business, good-will and equipment a substantial consideration consisting of either cash or credit for debts which they owed the Kraft corporations for goods purchased. They paid Mr. Broderick, the son-in-law of plaintiff, the sum of $2,400 for his business. The only two witnesses called in behalf of the defendants testified that the defendants paid the distributors possessing territory a consideration "for the good-will of their business". The good-will incident to a business constitutes a property right. (Secs. 655 and 993, Civ. Code.)

For nearly ten years the plaintiff conducted his business of buying and selling Kraft products in his district. He had a large number of customers whom he regularly supplied. No complaint was made to him of the manner in which he conducted the business. His exclusive right to the territory cost him $2,800, independently of the portion which he sold to his son-in-law. He bought a truck for $3,150 which he used exclusively in that business on which he painted a sign advertising the Kraft productions. He also had other equipment of small value and a quantity of unsold goods which he had purchased from the defendants. At the time of the agreement to purchase his business he owed the defendants the sum of $555.34. By request, pursuant to the letter from the corporation dated May 22, 1935, suggesting the purchase of their business, the plaintiff and his son-in-law met Mr. Parlett, the business manager of the Kraft corporations, July 27, 1935, at his office in San Francisco. Mr. Carey asked $3,000, but was then offered $2,000 for his business, including his truck, equipment, produce on hand and good-will. Mr. Broderick received $2,400 for his business, including a truck of less value than that of the plaintiff. Broderick's equipment was worth about $700. Broderick was employed and served as defendant's salesman at a salary of $40 per week. Mr. Carey preferred to keep his truck, which the respective parties finally agreed was then worth $500. He accepted the offer of a net sum of $1500 for the business and property, exclusive of the truck. As a part of the transaction an inventory of the Kraft products on hand was taken, and in part fulfillment of the transaction the

goods were delivered to the defendants. Mr. Parlett offered to employ Carey as their salesman at a salary of $35 per week, but the plaintiff told him he could not accept the employment as he planned to handle the Sheppard products, including what were called the "Grandma line" of cookies and cakes. It is contended the marketing of Sheppard products constituted a competing industry to that of the defendants.

Regarding the discussion at the time of the agreed purchase, with relation to plaintiff's plan to conduct a business in that district for the Sheppard products, there is an absolute conflict of evidence. The following testimony was adduced:

"Q. Was there anything said about your future plans? A. They asked me what I was going to carry, and I said I was going to carry the Grandma's line, and other than that I did not know. Q. What is the Grandma line? A. It consists of cakes and cookies. . . . Q. Was there anything said as to whether or not you were to be restricted? A. No sir, it was never mentioned."

It will be observed the plaintiff proposed to conduct a future business for the Sheppard Company in that district for the distribution of "cakes and cookies" and possibly some other side line. It appears that the Kraft products consist chiefly of cheese and mayonnaise. We are directed to no evidence which indicates that plaintiff's proposed business competed in any way with that of the defendants' enterprise. Moreover, it does not appear that the plaintiff actually did thereafter engage in selling even the "Grandma line of cakes and cookies".

Both Carey and Broderick testified that the subject of plaintiff's future business was discussed, and that Parlett did not then suggest that fact would make any difference in their purchase of plaintiff's Kraft business. Mr. Parlett denies those statements. The court definitely found that the Kraft business was sold to the defendants for $1500 which they then agreed to pay. It was not found that sale was made subject to any condition. In effect, the court determined that plaintiff's refraining from conducting a similar business in that territory was not made a condition upon which the sale was consummated. The plaintiff assumed the sale was completed. He turned over to the defendants the Kraft products which he had on hand, and never thereafter sold Kraft goods in that or any other territory.

The purchase price of the business was not paid, and the plaintiff wrote to the defendants, demanding payment of $1500, less the amount he then owed them. October 14th the Kraft corporation replied, stating for the first time that, ''It was our understanding this deal was entirely off . . . when you immediately entered into business with a competing line of merchandise within the same territory.'' In that letter the defendants specifically recognized that plaintiff had a property interest in the business which was subject to sale, but contend that the good-will of the business was destroyed by plaintiff's conducting a competing business in that district. There is no evidence to that effect. The court found that the sale was made with full knowledge that the plaintiff was going to engage in the business of selling the ''Grandma line of cakes and cookies'', and that he told them that was the reason he could not accept employment with them as a salesman. The findings were all adverse to the defendants. Judgment was rendered in favor of the plaintiff for the purchase price of his Kraft business, less the sum of $555.34, which he then owed them for products which had been previously purchased. From that judgment the defendants have appealed.

The validity of the judgment in this case depends upon the questions as to whether the plaintiff possessed a property interest in the Kraft business which he conducted in his district which was subject to sale, and whether there was a consideration for that sale. The appellants contend plaintiff held no property interest which is susceptible of sale and conveyance. For that assertion, they rely on the principle announced in the newspaper route cases of *Boehm* v. *Spreckels*, 183 Cal. 239 [191 Pac. 5], and *Otten* v. *Spreckels*, 183 Cal. 252 [191 Pac. 11], together with other similar cases in other jurisdictions.

In spite of the conflict of evidence in this case regarding the terms of the sale, we are of the opinion there is adequate proof to support the findings that the plaintiff's business in his district was purchased by the defendants for a specified price, which was not paid, but is still due and owing

The newspaper route cases above referred to are not authorities applicable to the facts of this case determining that this plaintiff was possessed of no property interest in his business of buying and selling Kraft products in his district which is susceptible of sale and transfer. The Boehm

and Otten cases are vitally different from the present cause. Those cases were suits for damages for the revocation of clear agencies created by contracts between the owner of the ''San Francisco Call'' and the respective plaintiffs to deliver that newspaper to the subscribers thereof. Boehm and Otten purchased their agencies directly from their principal, the owner of the newspaper, for a consideration. Their contracts provided that they were to serve the principal for its sole interest by distributing to its subscribers in specified districts the newspapers. Those agents acquired no property rights in the newspapers which they delivered. The newspapers which they delivered to the customers of their principal were not owned by the agents. The agents merely collected from the subscribers a sum specified by the owner. The collections from the customers were made for the benefit of the owner. All the interest which the agents possessed in the money collected from subscribers was to retain therefrom their agreed commissions for delivering the newspapers. The court held that those transactions created agencies under section 2295 of the Civil Code which were subject to revocation pursuant to sections 2355 and 2356 of the same code for the reason that the mere right of the agents to retain agreed commissions for their personal services from the subscription prices collected by them did not create property rights ''coupled with an interest'' in the newspaper business. The court specifically held in those cases that no sales of newspapers were made to the agents, that they held no title to the property which they handled, and that they merely acted as the agents of the owner of the newspaper. The court bases its opinions in those cases on that precise state of facts. It is said in the Boehm case in that regard, at pages 245 and 246:

''The fact would appear to be that the papers were sold by Spreckels to the subscribers. That was the condition when the contract was made, and there is nothing in the contract to indicate that it was to effect a change in the relations between the publisher and the subscribers. The agreement of Spreckels is that he will 'deliver' to Shepherd [a former owner of the route], 'a sufficient number of issues of said newspaper to supply said route'. In view of the fact that Spreckels had already agreed to sell and deliver the papers to the subscribers, *this language cannot reasonably be construed to import a sale of the same copies to Shepherd.* . . .

"The more reasonable conclusion in view of all the facts, is that it is only a rather awkward expression of the idea that Shepherd was to have the right and duty, *as agent of Spreckels,* of delivering the papers, soliciting and taking new subscriptions thereto, and conducting the business incidental thereto within the territory described, including the collection of the price of the subscriptions *owing to Spreckels.* The statements that Shepherd was to receive the papers, distribute them within the territory, and 'manage, conduct, and control said newspaper route in such manner and with such efficiency as shall be for the best interests' of said newspaper, 'and as shall maintain and preserve the extent and value of said newspaper route to the satisfaction of' Spreckels, *are apt expressions to describe the duties and powers of an agent. They strongly imply that an agency only was contemplated. They are meaningless as applied to a sale of the business, or a part thereof, to the carrier. For these reasons we conclude that the contract created an agency and did not declare a sale of property."*

In the present case, upon the contrary, the evidence is undisputed that this plaintiff purchased his territory from a stranger to the defendants for a valuable consideration; that plaintiff personally secured his own customers for the Kraft products; that he bought the Kraft goods outright, to which title was transferred to him; and that he sold them to his own customers on his own responsibility; that he paid the defendants for their goods whether he was able to resell them or not; that the accounts with his customers belonged to him, and the defendants had no interest in such claims; that the plaintiff was not employed by the defendants as their agent, and did not pay him a mere commission for his services; that plaintiff purchased and owned a truck, certain equipment and a quantity of goods on hand, together with the exclusive right to a specific territory, which constituted his own business which he had a right to sell and convey independently of the defendants. He was not a mere agent of the defendants without an interest coupled with that particular business.

It is true that the Kraft corporations did assume to maintain a general supervision over the distribution of their products to improve the service and satisfy the customers. It does not appear the defendants had any right to dictate to the plaintiff what customers he should supply, or the time

or manner of his deliveries of goods. Nor did they have any control over his customers. It does appear the defendants approved his purchase of the route, and did for nine years sell and deliver to him large quantities of their products, which he resold to his own customers. It may also be true that the defendants might refuse to sell goods to another person to whom the plaintiff might sell his business. But that does not affect the property rights to the business which he owned and controlled to a large extent.

We are therefore of the opinion the plaintiff in this case was not a mere agent of the defendants, which agency was subject to revocation, but, on the contrary, it appears that he held title to a property interest in the business of buying and selling Kraft products, which he had a right to sell and convey. The plaintiff therefore was entitled to maintain this action for the agreed purchase price of his business.

 Regardless of whether plaintiff actually held title to the business which was susceptible of sale and transfer, he honestly believed that he possessed that title to property and in good faith negotiated to sell it to the defendants for $1500 on that theory. Evidently the defendants also assumed that he owned a property interest in the business which he had a right to sell. They bought similar interests for substantial sums from other distributors. They dealt with the plaintiff as though they believed he had an interest susceptible of sale. They told him in the letter dated May 22, 1935, it was their "plan to buy the business", and they requested him to prepare a statement of *his business* so that they might know "exactly what your business is worth". But even though defendants secretly thought plaintiff had no interest in a business which he had a right to sell, and that their offer of $1500 merely amounted to a gift, the transaction would then become a compromise of a disputed claim which furnished adequate consideration for the sale. The statement of law applicable to such a situation, which appears in 1 Elliott on Contracts, page 417, section 237, is supported by a uniform line of authorities, as follows:

"The compromise of a claim which is asserted in good faith and of the validity of which the parties at the time entertain a doubt, and about which there is a *bona fide* controversy, *is a valuable consideration and will support a promise or a contract.*"

To the same effect are the following authorities: *Randisi* v. *Simone*, 26 Cal. App. 661 [147 Pac. 1176]; *Fairchild* v. *Cartwright*, 39 Cal. App. 118 [178 Pac. 333]; *Bennett* v. *Bennett*, 219 Cal. 153, 159 [25 Pac. (2d) 426]; *Gardner* v. *Watson*, 170 Cal. 570, 575 [150 Pac. 994]; 6 Cal. Jur. 175, sec. 120.

The question as to whether the sale depended upon the plaintiff's refraining from conducting a competing business in that district must be resolved against the appellants for the reason that the court found that the sale was consummated, and the inference is that no such condition attached to the transaction. There is evidence to support that implied finding.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 25, 1938.